UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
NYOKA WATSON, on behalf of
JAH-MERE WILSON, an infant,

                Plaintiff,

        -against-

JO ANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.
-----------------------------------------------------x

**AMENDED
MEMORANDUM and ORDER**

05-CV-859 (SLT) (VVP)

**TOWNES, United States District Judge:**

       Plaintiff, Nyoka Watson ("Ms. Watson"), brings this action on behalf of her young son,

Jah-mere Wilson ("Jah-mere"), alleging that defendant Jo Anne B. Barnhart, Commissioner of

Social Security (the "Commissioner"), improperly denied her son's application for Supplemental

Security Income. Although the Commissioner concedes that the administrative law judge's

decision was based on incomplete medical records and, therefore, moves to remand this case for

further administrative proceedings, plaintiff cross-moves for judgment on the pleadings pursuant

to Fed. R. Civ. P. 12(c), arguing that the case should be remanded solely for the calculation of

benefits. For the reasons set forth below, this Court agrees with the Commissioner and hereby

remands this case for a rehearing.

## FACTS

       Jah-mere was born at New York-Presbyterian Hospital - New York Weill Cornell

Medical Center ("NYPH") on January 16, 2001, the second child of the then-24-year-old Ms.

Watson. Jah-mere was not premature, but Ms. Watson's pregnancy was "complicated by

domestic violence" which forced her to move to a shelter (249).[1] In addition, at the time she

---

[1] Numbers in parentheses refer to pages in the Administrative Record. When citing to a document which appears more than once in the record, this Court will cite only to the first page on which that document appears.

gave birth, Ms. Watson tested positive for "GBBS" – presumably, Group B beta-hemolytic streptococcus (249). Although it is unclear whether Jah-mere also tested positive for GBBS, he spent the first few days of his life in the neonatal Intensive Care Unit ("ICU"), where he received several rounds of antibiotics (249).

Jah-mere returned to the hospital several times over the next year, but the records concerning some of these visits are sketchy. The Administrative Record contains documents suggesting that Jah-mere was hospitalized at NYPH one month after his birth in order to rule out sepsis secondary to a fever (249, 327). While these same documents suggest that all cultures came back negative and that Jah-mere was discharged after three days of antibiotic therapy, the Administrative Record does not contain the hospital records pertaining to this hospitalization.

Similarly, the Administrative Record contains documents suggesting that, at two months of age, Jah-mere was hospitalized at Mt. Sinai Hospital with a respiratory ailment, which was eventually diagnosed as RSV-negative bronchiolitis (249, 327).[2] Again, the Administrative Record does not contain any of the records generated during this hospitalization, so it is unclear how long Jah-mere remained at Mt. Sinai.

Jah-mere next visited the hospital on April 13, 2001, when he was brought to the Mt. Sinai Emergency Room with a day-old cough (98). Although the emergency room personnel noted that he had a history of bronchiolitis (98), a doctor diagnosed him as having a cough and a

_____

[2]Presumably, "RSV" refers to Respiratory Syncytial Virus, which is a major cause of respiratory illness in young children. *See* http:// www.kidshealth.org/parent/infections/ bacterial_viral/rsv.html. Bronchiolitis, which is frequently caused by RSV, is a common respiratory illness caused by an infection which affects the bronchioles – the airways within the lungs that connect the bronchi and the alveoli (or air sacs). *Id.*; http://www.biology-online.org/ dictionary/Bronchioles.

"URI" – an upper respiratory infection (97).  The doctor prescribed Albuterol, a bronchodilator, and directed that Jah-mere return for a follow-up the next day (97).

When Jah-mere returned the following day, he was still coughing but his lungs were clear (94).  The doctor diagnosed Jah-mere as having a cold and bronchiolitis, which was "resolving" with use of the Albuterol (94-95).  Ms. Watson was instructed to follow up with her doctor in two days (96), but there are no records to suggest that she ever did so.

A little over one week later, around 7:00 a.m. on April 23, 2001, three-month-old Jah-mere was brought to the NYPH Emergency Room after reportedly turning blue (242, 246).  According to Ms. Watson, she had been alerted to Jah-mere's condition after his seven-year-old sister found him unresponsive in his crib (248).  Ms. Watson told doctors that by the time she reached Jah-mere, he was blue, stiff in all extremities and unable to open his eyes (248).  Ms. Watson patted him on the back and, within a minute, Jah-mere coughed up a large amount of mucous and began to cry (242, 248).

Ms. Watson called for an ambulance, which took Jah-mere to Woodhull Hospital (240).  The Administrative Record does not contain records from Woodhull, other than a slip of paper indicating that Jah-mere was transferred to NYPH (238).  However, the records from NYPH indicate that Jah-mere "returned to baseline immediately after [the] event," and that Jah-mere was "happy, alert [and] interactive" by the time he arrived at NYPH's Emergency Room that afternoon (241).

Despite his apparent lack of distress, Jah-mere was transferred to the Pediatric ICU and remained hospitalized for the next four days.  During that time, doctors attempted to determine the cause of Jah-mere's acute life-threatening event.  After much testing, including a

neurological examination, the doctors diagnosed the cause as gastroesophageal reflux disease

("GERD") (278) – a condition in which a weak or defective sphincter at the top of the stomach

permits the stomach's contents to flow back up the esophagus. *See* http://www.kidshealth.org/

parent/systems/surgical/gerd_reflux.html. On April 27, 2001, Jah-mere was discharged in care

of his mother, who was instructed to follow up with a pediatrician, Dr. Lori Friedman, at "RGP"

within two weeks and with the pediatric gastroenterology clinic in three weeks (278).

According to notes included in the hospital records, Ms. Watson had been living in a

battered women's shelter prior to Jah-mere's April 23, 2001, hospitalization (246). At some

point prior to Jah-mere's discharge, Ms. Watson signed herself out of the shelter, telling a social

worker who visited her in the hospital that she was unhappy with the shelter's "attitude" (260).

Ms. Watson told hospital personnel that she intended to stay with a friend over the weekend, but

would go to a homeless shelter thereafter (260). The social worker informed her supervisor, Jay

Sandys, who was to follow the patient "in RGP" (260).

There is nothing in the Administrative Record to indicate that Ms. Watson followed up

with Dr. Friedman or the gastroenterology clinic, or sought any further treatment for Jah-mere

until July 26, 2001, when she brought Jah-mere to the Mt. Sinai Emergency Room.[3]  There, Jah-

mere presented flu-like symptoms: a fever, vomiting, diarrhea, abdominal pain, a runny nose and

a dry cough (100). Although Ms. Watson told hospital personnel that Jah-mere had a cough, and

---

[3]Although plaintiff alleges that Jah-mere also visited Mt. Sinai on July 16, 2001, *see*
Plaintiff's Memorandum of Law in Support of Cross-Motion for Judgment on the Pleadings, p.
4, one of the two documents cited in support of this allegation – page 103 – actually pertains to a
December 1, 2001 visit.  The other document to which plaintiff cites bears a date which can be
read as either 7/16/01 or 7/26/01 (102).  However, because this document is signed by the same
doctor who examined Jah-mere on July 26, 2001, and bears the exact same diagnosis, this Court
concludes that this document pertains to the July 26 visit.

had been "spitting out" for two days (100), there is nothing to suggest that Jah-mere's symptoms were caused by either asthma or GERD. Indeed, an examination revealed that Jah-mere had only "slight rhonchi" in his lungs, and the doctor concluded that Jah-mere had a viral infection (102).[4] Jah-mere was discharged without any prescriptions, but with directions to follow up with Jah-mere's pediatrician the next day (101).

Plaintiff's Memorandum of Law in Support of the Cross-Motion for Judgment on the Pleadings ("Plaintiff's Memo") alleges that plaintiff was treated at NYPH sometime in October 2001 for "severe" asthma-related symptoms. *Id.* at 5. However, the Administrative Record does not contain any medical records relating to this visit. Rather, plaintiff's allegations appear based on a form completed by a NYPH pediatrician, which suggests only that Jah-mere was "wheezing" and that Jah-mere's asthma was severe enough to require medical attention (114).

There is nothing in the record to suggest that Jah-mere received any further medical care until December 1, 2001. Hospital records for that date indicate that Jah-mere was not sick; he was in the Mt. Sinai Emergency Room only because Ms. Watson was accompanying a friend who had a sick baby (104). At some juncture, Ms. Watson dozed off and Jah-mere, left unattended, pulled a monitor down on himself (104). He never lost consciousness and, by the time he was examined by a doctor, appeared happy and playful (104).

A week later, on December 8, 2001, Ms. Watson brought Jah-mere back to the Mt. Sinai Emergency Room, complaining that he had had an upper respiratory infection for about a week

---

[4]The term "rhonchi" is variously defined as either "a coarse gurgling sound in the lungs that indicates the presence of thick fluid," http://www.ehealthmd.com/library/pneumonia/PNM_glossary.html, or "wheezes audible with the stethoscope, indicating a narrowing of small airways in the lungs." Http://www.medlit.info/guests/glossary/glossR.html.

(106). Jah-mere had a low-grade fever, but appeared alert, active and in no distress (106). After

an examination, which revealed that Jah-mere's lungs were clear and that he was not wheezing,

the doctor diagnosed Jah-mere with an upper respiratory infection caused by a virus (106-07).

Jah-mere was discharged with directions to drink lots of fluids, take Motrin as needed, and

follow up with his pediatrician in five days (108). There is nothing in the record to indicate

whether Ms. Watson followed up with a pediatrician as directed.

Plaintiff's Memo alleges that plaintiff was treated at NYPH again on January 13, 2002,

for asthma-related symptoms. *Id.* at 5. Again, the Administrative Record does not contain any

medical records relating to this visit; plaintiff's allegations appear based on a form completed by

a NYPH pediatrician. This form suggests that Jah-mere was not wheezing, but that Jah-mere's

asthma was severe enough to require medical attention and that he was treated with Albuterol

(114).

Ms. Watson's Application for Supplemental Security Income

On February 27, 2002, Ms. Watson filed an application for Supplemental Security

Income ("SSI") on Jah-mere's behalf. That application alleged that Jah-mere had asthma and

GERD (48), but provided few details concerning his treatment. Ms. Watson did not identify any

of Jah-mere's treating physicians; in the section requesting that she list his doctors she wrote,

"Jay Sandy [sic], CSW" – the social worker who had been assigned to Jah-mere's case following

his April 2001 hospitalization (49). Ms. Watson also made no mention of Mt. Sinai. Moreover,

although Ms. Watson listed "New York Cornell" as a hospital in which Jah-mere had received

treatment, the only indication that Jah-mere had ever been hospitalized was a circled number "1"

under the heading "Inpatient Stays" (51) and entries indicating that Jah-mere had undergone

certain tests at "Ped ICU" in April 2001 (52). Ms. Watson did not provide dates of Jah-mere's hospital stays, or even suggest that he had been hospitalized more than once.

Ms. Watson's application did, however, provide some information concerning her family's financial circumstances. For example, the application stated that Ms. Watson was supporting herself, Jah-mere and Jah-mere's sister on a $290 monthly grant from Aid to Families with Dependent Children (38, 41). The application also indicated that Jah-mere would sometimes miss appointments at NYPH because his mother lacked the money to pay for them (50).

Jah-mere's medical problems were readily apparent to the examiner who interviewed Ms. Watson on February 27, 2002, in connection with her application. The examiner wrote:

> Clmt's breathing was very heavy. He was very playful and was
> moving all over the places [sic]. His mother fed him and
> immediately had to burp him, he almost vomited and she had to
> continue burping him for a few minutes, child was coughing which
> made it hard for him to breathe (63).

Nonetheless, in a Function Report completed that day, Ms. Watson stated that Jah-mere's physical abilities were not limited (69).

At some point after filing her application, Ms. Watson completed additional paperwork, which provided additional details concerning Jah-mere's treatment and condition. On March 9, 2002, Ms. Watson completed a two-page form in which she stated that Jah-mere sometimes had as many as four asthma attacks a day (76). On that same form, Ms. Watson listed the emergency rooms in which Jah-mere had received treatment for his asthma over the preceding 12 months: New York Cornell, North General and "Mount Sanil" (76). Ms. Watson also completed a form in which she identified a "Dr. Kescher" of "NY Cornell Hospital" as a physician who Jah-mere saw every month and had seen on July 3, 2002 (72).

The Disability Examiner, Scott Wood, was eventually able to obtain Jah-mere's records from Mt. Sinai, including records indicating that Ms. Watson had taken Jah-mere to the emergency room on March 17, 2002, because he had vomited several times and had diarrhea (91-93). The doctor attributed his condition to gastroenteritis (an inflammation of the stomach and intestines) and to GERD (93). The doctor directed Ms. Watson to continue with the medicines which had been prescribed by "Peds GI," and directed Ms. Watson to follow up with Jah-mere's pediatrician the following week (93). Again, there are no records that Ms. Watson ever followed up with a pediatrician.

Wood also succeeded in obtaining a form from a Dr. Lori Keschner of NYPH (111-116). This form confirmed that Jah-mere had "reflux," but stated that this was being controlled with medication (113). The form also noted that Jah-mere had "reactive airway disease," and used Albuterol twice a week as needed (113). Dr. Keschner stated that Jah-mere had been hospitalized twice and had visited the emergency room about four or five times (113). The form listed the dates on which these visits had taken place, and provided a cursory description of each (114).

Dr. Keschner's report indicated that Jah-mere's activities were not affected by his impairments, and that his sensory abilities and fine and gross motor skills appeared age-appropriate (115). It was unclear, however, whether Dr. Keschner was Jah-mere's treating pediatrician. Nothing in Dr. Keschner's report described any occasions on which she had personally examined Jah-mere. The form indicated that Dr. Keschner had first seen Jah-mere on February 8, 2001, and had most recently examined him in April 2002, but that portion of the form which requested information concerning the "Frequency of Treatment" was left blank (111).

In March 2002, Jah-mere was examined by a Dr. Seymour L. Handler of K-M.D. Medical Services in connection with Ms. Watson's application for SSI. According to Dr. Handler's report, Ms. Watson informed him that Jah-mere had ten episodes of asthma a week, used a nebulizer four times a day and had visited the NYPH's emergency room twelve times in the preceding month (86). However, Dr. Handler's examination found no evidence of asthma; Jah-mere's lungs were clear and Dr. Handler did not hear any wheezing, rales or rhonchi (88).[5] Nonetheless, Dr. Handler concluded that Jah-mere had a history of asthma and gastroesophageal reflux, and that both of these were chronic conditions (88-89). Dr. Handler offered no opinion as to whether these conditions limited Jah-mere's activities in any way.

Dr. Handler's report correctly indicated that Jah-mere had been hospitalized on three occasions. However, Dr. Handler's descriptions of these hopsitalizations were, like other entries in the history portion of his report, of questionable accuracy. Specifically, the report stated that Jah-mere had been hospitalized at Mt. Sinai Hospital in 2001 for asthma and meningitis and again in March 2001 "for breathing difficulties and observation for asthma" (86). The report also noted that Jah-mere had been hospitalized at "N.Y. Hospital in 4/2001" for asthma rather than for GERD (86).

Dr. Handler's reference to the three hospitalizations was corroborated elsewhere in the medical records obtained by Disability Examiner Wood. For example, the medical records from Jah-mere's July 26, 2001, emergency room visit clearly stated that Jah-mere had "3 hospitalizations" (100). Moreover, Dr. Keschner's form suggested that two of those hospitalizations had taken place at NYPH (114). Yet, Wood did not manage to obtain records of

---

[5]The term "rales" refers to clicking, bubbling, or rattling sounds that occur when air moves through fluid-filled airways. Http://www.ehealthmd.com/library/pneumonia/PNM_ glossary. html.

any of these hospitalizations. Wood also did not obtain the records relating to Jah-mere's

treatment on October 2001 and January 13, 2002, although this treatment is discussed in Dr.

Keschner's report (114).

Sometime before April 17, 2002, Wood requested medical advice from Dr. Julianne

Randall, a State-affiliated doctor. He did so by completing a form, on which he wrote:

> Clmt has a H/O [history of] asthma and GERD. There have been
> several E.R. visits and three hosp (in 2001). Clmt rc'd a marked in
> domain 6. Do not know if clmt's impairment medically equals?
> Please review and advise (109).

Although Wood did not list the documents which accompanied his form, Dr. Randall's

response suggests that he attached only the records from the emergency room visits on April 13,

July 26, December 1, and December 8, 2001, and March 17, 2002 (109). Based on these

documents, Dr. Randall apparently agreed that Jah-mere had a "marked" limitation, writing

"Suggest Domain #6 is marked" (109). However, she also implied that Jah-mere's impairments

did not medically equal the listings, noting that Jah-mere's four most recent emergency room

visits had not even required physician intervention (109).

On May 14, 2002, Dr. Randall made her findings explicit by completing a "Childhood

Disability Evaluation Form" (117-22). In that form, she opined that Jah-mere had no limitation

whatsoever in five of the six domains set forth in 20 C.F.R. § 416.926a(b)(1), but had a

"marked" limitation in the sixth domain – "Health and physical well-being" (119-120). She

concluded that Jah-mere's impairment or combination of impairments, although severe, did "not

meet, medically equal, or functionally equal the listings" (117). On May 22, 2002, Ms. Watson

was informed that her application for SSI was denied (29).

Events between the Denial of the SSI Application and the ALJ's Decision

Shortly thereafter, Jah-mere was evaluated by a Special Educator, Physical Therapist and Speech/Language Pathologist (124). A report issued on June 18, 2002, indicates that Jah-mere was referred for evaluation by his mother, who was concerned about his speech, feeding, balance and coordination (124). The Special Educator concluded that Jah-mere had no significant delays (124). However, the Speech/Language Pathologist, Adam J. Kolesar, concluded that Jah-mere had delays of nearly 50% in both language development and feeding (130). Accordingly, the evaluators recommended that Jah-mere receive "speech/feeding therapy" through the Early Intervention Program ("EIP") (125).

On July 31, 2002, Ms. Watson participated in an initial "IFSP" meeting to determine what services Jah-mere would receive (143).[6] Ms. Watson and four other participants discussed Jah-mere's asthma and reflux problems, but concluded that, "overall," Jah-mere was "a healthy child" (144). Jah-mere was referred to a special educator and an occupational therapist for additional evaluations (150).

On August 13, 2002, a Special Educator, Tatyana Bekker, evaluated Jah-mere. She determined that Jah-mere's cognitive, social emotional, fine motor, and speech and language development skills were all delayed, but by no more than 30 percent (137, 139). Ms. Bekker recommended that he be referred for both a speech and language evaluation and an occupational therapy evaluation (139).

That same day, Jah-mere was evaluated by Gail Fisher, an Occupational Therapist. She assessed his gross motor skills as "within functional limits" (142). She had difficulty assessing his fine motor skills "due to his hyperactivity, short attention span, . . . inability to follow simple

---

[6]The abbreviation, "IFSP," stands for "Individualized Family Service Plan" (143).

directions/instructions and inability to tolerate handling" (142).  Nonetheless, Ms. Fisher opined that Jah-mere's hand skills fell "below the 33% range" and that his visual-motor/perceptual skills and graphomotor skills were "below age level" (142).  Ms. Fisher recommended that Jah-mere receive occupational therapy services in a center-based program (142).

By October 31, 2002, Jah-mere was enrolled in ABC Cassidy's Place, where he was receiving services from speech and occupational therapists and a Special Educator.  Their quarterly evaluations for the three-month period ending January 31, 2003, along with a report concerning a January 7, 2003, IFSP meeting, were included in the Administrative Record at the time the ALJ rendered his March 28, 2003, decision (173-85).

Although there were several significant medical developments during the 10-month period following the May 2002 denial of Ms. Watson's SSI application, medical records relating to these developments were not included in the Administrative Record which was before the ALJ.  Accordingly, there was nothing in that record to indicate that on August 31, 2002, Jah-mere was hospitalized yet again.  Jah-mere had developed a temperature the day before and started to sweat and to become increasingly sleepy (327).  Ms. Watson took him to Mt. Sinai Hospital, where doctors found that he was difficult to arouse, had a low blood pressure and was hypothermic (327).  Jah-mere was subsequently transferred at Ms. Watson's request to NYPH, where he arrived in the wee hours of September 1, 2002, "awake and interactive and almost back to his baseline" (327).  Nonetheless, Jah-mere remained in ICU for most of September 1, 2002, and was then hospitalized until September 3, 2002, in order to rule out infections and to determine the cause of his symptoms (325, 341).  During that time, doctors ordered a metabolic workup and gave Ms. Watson a glucometer to check his blood sugar (343).

On September 5, 2002, Jah-mere returned to the NYPH Urgent Care Clinic for a follow-

up. Jah-mere was "doing very well" (360). However, the results from the metabolic workup were "still pending," and Ms. Watson was not using the glucometer, stating that she was never taught how to do so while Jah-mere was in the hospital (360).

The Administrative Record which was before the ALJ also contained no mention of two subsequent emergency room visits. On September 16, 2002, Ms. Watson brought Jah-mere to the NYPH emergency room, stating that Jah-mere was not eating, but only drinking milk and juice (363). Jah-mere was not in distress; he was "playful" and "active" and was not wheezing (365). Although Ms. Watson complained that Jah-mere was not eating, medical personnel observed him eating "Cheez Doodles" (365). Ms. Watson was referred for a nutrition consultation and advised to be firm and set limits with respect to Jah-mere's intake of "junk food" (365).

On March 9, 2003, Ms. Watson brought Jah-mere to the Emergency Room at Mt. Sinai Hospital, reporting three episodes in which Jah-mere coughed until he gagged and vomited (393). Ms. Watson also reported that Jah-mere's eyes had been watering and rolled back in his head on at least one occasion (393). Doctors diagnosed Jah-mere's symptoms as having been caused by asthma and an ear infection (395). Doctors prescribed Zithromax (an antibiotic) and an Albuterol nebuliser, then discharged Jah-mere with instructions to follow up with Jah-mere's own pediatrician the next day (395). There is nothing in the Administrative Record to suggest that Ms. Watson ever did so.

The ALJ's Actions

At some unspecified point after being assigned this case, ALJ Joseph K. Rowe appointed Dr. Mathilda B. Brust, a pediatrician and former clincal instructor at both Columbia University's College of Physicians and Surgeons and New York University (158), as an independent medical

expert.  Although the ALJ sent Dr. Brust all the medical records in his possession, Dr. Brust's report indicates that these included only a fraction of the medical records actually in existence (228).  Significantly, Dr. Brust had no records of any of Jah-mere's hospitalizations.  Moreover, Dr. Brust had records of only five of his emergency room visits: the visits on April 13, April 14, July 26, December 1 and December 8. 2001, and March 17, 2002 (228).  Dr. Brust received copies of Dr. Handler's report and Dr. Keschner's form dated May 7, 2002, as well as copies of both of the documents written by Dr. Randall: her April 17, 2002, response to Wood's Request for Medical Advice and her May 14, 2002, report (228).  However, Dr. Brust was not sent, and never subsequently received, any medical records for the period after mid-March 2002.

In her report to the ALJ, Dr. Brust stated that she had "no reports from the emergency rooms or clinics or [sic] frequent or severe asthmatic episodes" (229).  Dr. Brust noted that Jah-mere had exhibited wheezing or other asthma symptoms on only one of his five visits to the Mt. Sinai Emergency Room (228).  In addition, Dr. Brust read Dr. Keschner's report as indicating that Jah-mere had presented with wheezing on only one of the seven visits chronicled in that report (228).

Dr. Brust concluded that Jah-mere's asthma was "mild and intermittent" (462), and theorized that his asthma might "be secondary to minor aspirations [of stomach contents] due to GER" (229).  She acknowledged, however, that there were no x-ray reports to confirm her theory (229), and that the records reflected only one instance of GERD accompanied by aspiration of stomach contents (229).  Nonetheless, believing that Jah-mere's GERD was likely to improve with age, Dr. Brust concluded that Jah-mere had "a less than marked limitation in the area of general health and well being as his asthma and GER are chronic problems which require on-

going medical intervention" (229).

Dr. Brust was originally sent only one set of documents relating to Jah-mere's special education evaluations – the June 18, 2002, evaluations relating to Jah-mere's eligibility for Early Intervention (228). Dr. Brust read these evaluations as indicating that Jah-mere had only one area of delay, that being in language development (229). Based solely on Mr. Kolesar's evaluation, which indicated that Jah-mere's language was delayed by nearly 50%, Dr. Brust initially concluded that Jah-mere had "a marked delay in the area of acquiring and using language" (229).

Sometime after she finished a typewritten report which embodied the aforementioned conclusions, however, Dr. Brust received additional documents relating to Jah-mere's progress in the EIP. These documents included the initial EIP evaluations from August 2002 which, as discussed above, indicated that Jah-mere was not delayed more than 30% in any domain (229). In addition, Dr. Brust received documents pertaining to the January 7, 2003, IFSP meeting, which indicated that Jah-mere was "using quite a few words" (229).

On February 24, 2003 – the very day on which ALJ Rowe held a hearing with respect to this case – Dr. Brust inked a handwritten addendum to her typewritten report. This addendum contained the following conclusion: "Eval of 8/02 places language skills much less than 50% delayed [. M]aking good progress" (229). Although this conclusion implied a change in Dr. Brust's assessment of Jah-mere's language delay, Dr. Brust's addendum suggested the contrary, stating, "Conclusion as above" (229).

ALJ Rowe asked Dr. Brust to appear at the February 24 hearing in this case. Before she testified, however, Dr. Brust heard Ms. Watson state that Jah-mere had problems with "glucose" (460) and had been hospitalized after "his sugar dropped" (461). Dr. Brust, who did not have

medical records for the 11 months between mid-March 2002 and the hearing, tacitly

acknowledged that she had no prior knowledge of the glucose problem, stating:

> "[T]he only thing that comes as a surprise is his glucose problem.
> What is it, too high or too low?" (461).

Ms. Watson responded that Jah-mere's blood sugar was too low, and stated that this

hypoglycemic condition had been diagnosed during Jah-mere's August 31 hospitalization (461).

However, Ms. Watson greatly exaggerated both the length and severity of that hospitalization,

stating:

> He was in ICU for a week. They moved him from ICU, put him on
> a regular floor for four days and then they released him (461).

Dr. Brust instantly recognized that medical records were missing, saying: "We don't have

any of those records" (462). Ms. Watson then apologized for forgetting to bring the records

(462), implying that she either had such records in her possession or could obtain copies.

Nonetheless, the ALJ did not suggest adjourning the hearing, and Dr. Brust did not request the

opportunity to review these records before rendering her opinion.

Instead, for reasons which are unclear from the record, Dr. Brust abruptly changed her

conclusions from those which appeared in her written report. Although her report clearly stated

that Jah-mere had "a less than marked limitation in the area of general health and well being"

(229), Dr. Brust now testified that Jah-mere had a "marked limitation" in the domain of "Health

and physical well-being" (464). In addition, although her written report stated that Jah-mere had

"a marked delay in the area of acquiring and using language" (229), Dr. Brust testified at the

hearing that Jah-mere had "a less than marked limitation due to his language delay," and that his

language skills were "improving" (463).

Following the hearing, ALJ Rowe announced that he intended to "reread the file and . . .

render a Decision as soon as possible" (466). That decision was rendered on March 28, 2003. Although ALJ stated in his decision that the record had been " held open following the hearing for the claimant's mother to send in any relevant medical evidence" (17), the ALJ did not specifically request the records relating to Jah-mere's August 31, 2002, hospitalization or advise Ms. Watson on the record that she should obtain such documents. Ms. Watson did not submit any additional documentation (17).

The ALJ's Decision

The ALJ's March 28, 2003, decision begins by setting forth the applicable legal standards (18-19). Although neither party asserts that ALJ's recitation of these standards is incorrect, this Court will briefly set forth these standards in order to facilitate discussion of the remainder of the ALJ's decision.

The Social Security Act provides that "[a]n individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). A "disabling impairment" of the sort described in this statute has been defined in the regulations to mean "that the impairment or combination of impairments . . . [m]ust meet, medically equal, or functionally equal the listings" – *i.e.*, the "Listing of Impairments" in appendix 1 of subpart P of 20 C.F.R., part 404. *See* 20 C.F.R. § 416.911(b)(1).

The regulations provide that, in analyzing whether an impairment functionally equals a listing, one must consider how a child functions in six "domains" – "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). These

domains are: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." *Id.* To "functionally equal the listings," a child's impairment(s) must result in either "marked" limitations in two domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The terms "marked" and "extreme" are defined at some length in the regulations. 20 C.F.R. § 416.926a(e).

The determination as to whether a child is disabled is made through a three-step process, which is set forth in 20 C.F.R. § 416.924. First, one must consider whether the child is "working," and whether such work constitutes "substantial gainful activity." 20 C.F.R. § 416.924(b). If the child is working and engaged in "substantial gainful activity," he or she is not disabled. *Id.* Second, one must determine whether the child has a medical determinable impairment which is "severe," as opposed to a slight abnormality which causes no more than minimal functional limitations. 20 C.F.R. § 416.924(c). If the child does not have a "severe" impairment, he or she is not disabled. *Id.* Third, one must determine whether the child has an impairment or combination of impairments which "meet, medically equal, or functionally equal the listings." 20 C.F.R. § 416.924(d). If so, and if the impairments meet the duration requirement, the child is disabled. Otherwise, the child is not disabled.

ALJ Rowe engaged in this three-step analysis. He summarily determined that the two-year-old Jah-mere was not working or engaged in substantial gainful activity and had three medically determined severe impairments: bronchial asthma, GERD and speech and language delays (18). He also determined, with little discussion, that these impairments had lasted for more than 12 months, and did not meet or medically equal any listed impairment (19). ALJ Rowe then turned to the question of whether Jah-mere's impairments functionally equaled a

listing.

The ALJ first briefly and incompletely summarized the regulatory definitions of "marked" and "extreme" (19). Next, he summarized the documents authored by Drs. Randall, Handler, Keschner and Brust (20),[7] explicitly stating that he "agree[d] with the opinion of Dr. Brust" (21). However, for reasons which are unclear, the ALJ then adopted the findings set forth in Dr. Brust's written report, rather than the opinions she gave in her testimony at the hearing. Accordingly, he found that Jah-mere's speech and language delays resulted in a "marked" limitation in the domain of "Acquiring and using information," a "less than marked limitation" in the domain of "Health and physical well-being," and no limitation in the other four domains (22). Since Jah-mere had "marked" limitations in only one of the six domains, the ALJ concluded that Jah-mere was not eligible for SSI as of March 28, 2003 (22-23).

Plaintiff's Appeal

Although plaintiff had proceeded *pro se* before the ALJ, plaintiff was represented on appeal by Howard S. Davis, a *pro bono* attorney affiliated with Legal Services for Children, Inc. (230). On or about April 8, 2004, Mr. Davis sent the Appeals Council a seven-page letter (230-36) and 187 pages of documents, most of which had been previously missing from the Administrative Record (236-A - 421). These documents included hospital records relating to Jah-mere's April 23, 2001, and August 31, 2002, hospitalizations (239-82, 321-59), as well as medical records relating to Jah-mere's emergency room visits following Wood's May 2002 Disability Determination (360-65, 392-96). These documents also included various documents

---

[7]Because the K-M.D. letterhead was not aligned properly, the top of each page of Dr. Handler's report appears to state that it was prepared by "Jahmere Wilson." As a result, the ALJ's decision in this case incorrectly attributes this report to "Dr. J. Wilson," not to Dr. Handler (20).

generated by therapists and teachers involved in the EIP, such as Quarterly Reports for the period between January 31 and April 30, 2003 (389-91); documents from IFSP meetings held on September 30, 2002 (371-76) and June 16, 2003 (409-413); and questionnaires completed in September 2003 by Jah-mere's Special Education Teacher, Noelle Vercesi, and his Speech Therapist, Tracey Hirn (397-407).

The September 2003 questionnaires were particularly significant, in that both Ms. Vercesi and Ms. Hirn responded to questions concerning the nature and degree of Jah-mere's limitations. Ms. Vercesi's questionnaire stated that Jah-mere had "marked" limitations in four of the six domains – "Acquiring and using information," "Attending and completing tasks," "Interacting and relating with others," and "Moving about and manipulating objects" – but no limitations in the other two domains – "Caring for yourself" and "Health and physical well-being" (398-402). Ms. Hirn, on the other hand, opined that, although Jah-mere had a "marked" receptive language problem (404), that problem did not affect his ability to interact and relate with others, to care for himself or to move or manipulate objects (405-06). Ms. Hirn opined that Jah-mere had limitations in the other three domains, but that his limitations were "less than marked" in two of these domains – "Acquiring and using information" and "Attending and completing tasks" – and "marked" only in the domain of "Health and physical well-being" (405-06).

In his seven-page letter, Mr. Davis specifically noted that, as far as he could determine, the ALJ had made no effort to contact either Ms. Vercesi or Ms. Hirn or to solicit their opinions (234-35). Mr. Davis then argued that the ALJ had failed (1) to develop the record, (2) to consider whether Jah-mere's severe speech and language delays resulted in limitations in domains other than acquiring and using information and (3) to consider whether Jah-mere's

speech and language impairment equaled a listing entitled, "Communication impairment, associated with documented neurological disorder" (231).

The Appeals Council declined to review the ALJ's decision. In a notice dated January 18, 2005, the Appeals Council informed Ms. Watson that it considered both Mr. Davis's letter and the additional records he submitted, but "found that this information [did] not provide a basis for changing the Administrative Law Judge's Decision" (4-5). Accordingly, ALJ Rowe's decision became the Commissioner's final decision in this case. Plaintiff subsequently instituted this action.

## DISCUSSION

<u>Standard of Review</u>

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). In deciding whether the Commissioner's decision is supported by substantial evidence, however, a court must first determine whether the claimant has had "a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Echevarria v. Secretary of Health & Human Services*, 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold v. Secretary of HEW*, 463 F.2d 38, 43 (2d Cir. 1972)).

Because of the "essentially non-adversarial nature" of a benefits hearing, "[t]he ALJ, unlike a judge in a trial, must . . . affirmatively develop the record." *Id.*; *see Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Where a claimant is proceeding *pro se*, "the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Echevarria*, 685 F.2d at 755 (internal citations and quotations omitted). To

assist a *pro se* claimant in developing his or her case, the ALJ is obligated, *inter alia*, "to search the facts by collecting all relevant medical records and posing questions to the claimant." *Baize v. Barnhart*, No. CV-02-3654 (SJF), 2003 WL 23303419, at *7 (E.D.N.Y. Nov. 24, 2003) (citing *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). "A reviewing court must determine whether the ALJ 'adequately protect[ed] the rights of [a] pro se litigant by ensuring that all of the relevant facts [are] sufficiently developed and considered.'" *Echevarria*, 685 F.2d at 755 (quoting *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980)) (bracketed material in *Echevarria*).

As should be obvious from the foregoing statement of facts, ALJ Rowe utterly failed to protect plaintiff's rights by essentially disregarding all indications that there were significant gaps in the medical records. These indications existed both in the records themselves and in the testimony at the February 24, 2003, hearing. For example, the records pertaining to Jah-mere's July 26, 2001, visit to Mt. Sinai's emergency room clearly state that Jah-mere had three prior hospitalizations (100). Yet, the Administrative Record before the ALJ did not contain records of even one of the three. Similarly, the form completed by Dr. Keschner indicates that Jah-mere sought medical attention for asthma attacks on March 12 and/or 13, 2001; in October 2001; and on January 13, 2002 (114). The Administrative Record contained no records for these visits. There were also no records relating to Jah-mere's fourth hospitalization, or to any of the three visits to the emergency room which occurred following this August 31-September 3, 2002, hospitalization.

The gaps in the medical records were highlighted at the February 24, 2003, hearing, when Ms. Watson testified concerning Jah-mere's "glucose" problem (460-61). Dr. Brust noted that this condition came "as a surprise" to her, and proceeded to adduce testimony from Ms.

Watson that Jah-mere had been diagnosed with hypoglycemia during Jah-mere's "August 31" hospitalization (461). Dr. Brust immediately recognized that she did not have records of this hospitalization, prompting Ms. Watson to apologize for forgetting to bring these records (462). Although Ms. Watson's apology implied that she either had such records in her possession or could obtain copies, the ALJ himself made no effort whatsoever to obtain these documents. Worse yet, his decision principally relied on Dr. Brust's written report, which was not only prepared before Dr. Brust learned of deficiencies in the records but which reached conclusions different from those to which Dr. Burst ultimately testified.

Dr. Brust's report itself also should have alerted the ALJ to deficiencies in the records relating to Jah-mere's developmental delays. Dr. Brust stated that Jah-mere had a significant delay in language development, and that he had been "accepted for early intervention services" (229). Yet, Dr. Brust's typewritten report stated that she did not even know if Jah-mere was receiving those services, much less whether his language skills had improved in the eight months since his initial evaluation (229).

Shortly before the hearing, Dr. Brust received records relating to an IFSP meeting conducted on January 7, 2003. Although Dr. Brust's handwritten addendum to her report indicates that this document stated that Jah-mere was receiving both occupational therapy and speech/language services (229), the ALJ made no effort to obtain additional documents or opinions from these service providers concerning the degree of Jah-mere's language delay. Instead, the ALJ essentially ignored this information altogether. He relied on the typewritten portions of Dr. Brust's report – in which she concluded, based solely on Mr. Kolesar's June 2002 evaluation, that Jah-mere had "a marked delay in the area of acquiring and using information as

his language was delayed by 50%" (229) – and ignored Dr. Brust's testimony that Jah-mere had "a less than marked limitation due to his language delay" (463).

The gaps in the record were painstakingly documented in Mr. Davis's April 8, 2004, letter to the Appeals Council.  Prior to Mr. Davis's submission, the Administrative Record contained only about 150 pages of medical records and documents relating to the provision of EIP services (78-227).  Mr. Davis submitted 187 pages of additional records, most of which had not previously been included in the Administrative Record.  Among the new documents submitted by Mr. Davis were records of all four hospitalizations, records relating to at least three additional emergency room visits, and numerous records from the EIP.

The regulations expressly permit the Appeals Council to consider "new and material" evidence not contained in the record before the ALJ, provided that it "relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. § 404.970(b). Evidence is "new" if it is "not merely cumulative of what is already in the record."  *Lisa v. Secretary of Health & Human Services*, 940 F.2d 40, 43 (2d Cir. 1991).  Evidence is considered "material" if it is both relevant to the claimant's condition during the time period for which benefits were denied and probative.  *Id.*  For evidence to be considered material, there must also be "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide the claimant's application differently."  *Id.*

As previously discussed, many of the documents submitted by Mr. Davis were new. Moreover, some of the documents were unquestionably material.  Dr. Brust's written report, which concluded that Jah-mere had a "less than marked" limitation in the domain of "Health and physical well-being," relied in part on the lack of any "reports from the emergency rooms or clinics [of] frequent or severe asthmatic episodes." (229).  However, the documents submitted by

Mr. Davis included records of such episodes, the most recent of which had occurred on March 9, 2003 – less than three weeks before ALJ Rowe issued his decision.  Since this evidence effectively undercut Dr. Brust's rationale for concluding that Jah-mere had a "less than marked" limitation in the domain of "Health and physical well-being," there is at least a reasonable possibility that the new evidence would have influenced the ALJ to change his assessment of Jah-mere's limitations in that domain.

There is also a reasonable possibility that the ALJ may have been influenced by Ms. Vercesi's questionnaire, in which she opined that Jah-mere had "marked" limitations in four of six domains (397-402).  Although this questionnaire is dated September 24, 2003, the document itself indicates that Ms. Vercesi had been Jah-mere's Special Education teacher from July 2002 until July 2003, suggesting that it might be based on observations during the pre-determination period (397).  Moreover, even if her assessment were based on post-determination observations, it nonetheless may have related to the period before that date.  In analogous circumstances, post-determination diagnoses which relate to a condition that existed but was undiagnosed during the pre-determination period, or which reveal the severity of an illness which, although recognized, was not fully understood at the time of the hearing, have been held to relate to the pre-determination period.  *See*, *e.g.*, *Richardson v. Apfel*, 44 F. Supp. 2d 556, 562 n. 3 (S.D.N.Y. 1999) (quoting *Bosmond v. Apfel*, No. 97 Civ. 4109 (RPP), 1998 WL 851508, at *12 (S.D.N.Y. Dec. 8, 1998)).

The Commissioner concedes that the Appeals Council should have not only reviewed Jah-mere's case, but should have remanded the case to the ALJ for further consideration.  *See* Defendant's Memorandum of Law in Support of her Motion for Remand ("Defendant's Memo") at 13.  Defendant, therefore, urges this Court to remand the case for further proceedings.  In so

arguing, defendant principally relies on *Rosa v. Callahan*, 168 F.3d 72 (2d Cir. 1999), in which the Second Circuit stated that it is appropriate to "remand[ ] . . . for a rehearing" in cases "in which the primary problem with the decision below is that the ALJ failed adequately to develop the record," unless there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision." *Id.* at 83 and n. 8.

Plaintiff, however, argues that further evidentiary proceedings would serve no useful purpose and that this Court should reverse the Commissioner's determination and remand the case solely for the calculation of benefits. Plaintiff argues that the ALJ already found that Jah-mere had a "marked" limitation in the domain of "Acquiring and using information," and that the new evidence provided by Mr. Davis constitutes "overwhelming" proof that Jah-mere also has a "marked" limitation in the domain of "Health and physical well-being." *See* Plaintiff's Memo at 15.

Plaintiff's argument is principally based on portions of 20 C.F.R. § 416.926a(e)(2), the regulation which defines the term, "marked." This regulation provides, *inter alia*, that

> For the sixth domain of functioning, "Health and physical well-being," we [the SSA] may also consider you [the claimant] to have a "marked" limitation if you are frequently ill because of your impairment(s) or have frequent exacerbations of your impairment(s) that result in significant, documented symptoms or signs. For purposes of this domain, "frequent["] means that you have episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more. We may also find that you have a "marked" limitation if you have episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks, or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity.

20 C.F.R. § 416.926a(e)(2)(iv) (bracketed material added). Plaintiff argues that Jah-mere has a "marked" limitation under this section because he had "16 emergency hospitalizations" in the

26-month period between February 2001 and March 9, 2003. Plaintiff's Memo at 19.

Although Jah-mere was unquestionably brought to the emergency room on a regular basis, this Court cannot determine the merits of plaintiff's argument because it is unclear how many of those visits were genuine emergencies or were related to Jah-mere's impairments. This Court is well aware that some patients use emergency rooms as primary care facilities. *See*, *e.g.*, Craig A. Walls, M.D., Ph.D., Karin V. Rhodes, M.D. and Jae J. Kennedy, Ph.D., *The Emergency Department as Usual Source of Medical Care: Estimates from the 1998 National Health Interview Survey*, 9 Academic Emergency Med. 1140 (2002) (noting that in a cross-sectional sample of 56 Emergency Departments, 23 percent of patients named the emergency room as their usual source of care). The record in this case strongly suggests that Jah-mere is such a patient. In her February 2002 application for SSI, Ms. Watson did not provide the name of any pediatricians, but listed a NYPH-affiliated social worker as Jah-mere's doctor (49). Although Ms. Watson subsequently named Dr. Keschner as Jah-mere's pediatrician (72), the Administrative Record contains no chart or other medical records to suggest that Jah-mere ever visited Dr. Keschner on a regular basis. To the contrary, Plaintiff's Memo indicates that the only visits mentioned in Dr. Keschner's form (114) are emergency room visits. *See* Plaintiff's Memo at 16-17.

Moreover, some of Jah-mere's emergency room visits appear to be have been for routine pediatric problems unrelated to his asthma or GERD. On July 26, 2001, for example, Jah-mere was treated for flu-like, viral symptoms (100-02). On December 1, 2001, Jah-mere was treated for an accident which occurred in the hospital while he and his mother were waiting for a friend to receive treatment (104). On September 16, 2002, Ms. Watson brought Jah-mere to the

emergency room, complaining that he was not eating – a complaint which doctors attributed to Jah-mere's excessive consumption of "junk food" (363-65).  Accordingly, it is unclear how many of Jah-mere's emergency room visits were true emergencies related to Jah-mere's impairments.

Even assuming that all 16 visits were such emergencies, 20 C.F.R. § 416.926a(e)(2)(iv) would not require that the Commissioner find Jah-mere to have a "marked" limitation in the domain of "Health and physical well-being."  Under that regulation, illnesses are considered "frequent" only if they both occur an average of three times a year and last for at least two weeks on each occasion.  Although Jah-mere may have been ill considerably more than three times a year, there is nothing to suggest that any of his illnesses – even those requiring hospitalization – lasted as long as two weeks.  Moreover, the record suggests that Jah-mere was hospitalized largely in order to rule out potentially serious illness and to facilitate diagnoses, rather than to treat Jah-mere for acute symptoms.

While 20 C.F.R. § 416.926a(e)(2)(iv) expressly states that the Commissioner may find that a claimant has a "marked" limitation if he or she has episodes of illness "that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks," the regulation does not require that the Commissioner make such a finding.  Rather, the Commissioner *may* make such a finding, "if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity" to the effect of the longer, less frequent illnesses described earlier in subsection (e)(2)(iv).  Without a complete record, this Court cannot find that the record in this case will compel the Commissioner to conclude that Jah-mere has a "marked" limitation in the domain of "Health and physical well-being" and that remand is, therefore, unnecessary.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Although plaintiff correctly notes that both Dr. Randall and Dr. Brust ultimately found that Jah-mere had a "marked" limitation in the domain of "Health and physical well-being," this Court is reluctant to rely on either of their assessments. Both doctors made their assessment on the basis of very incomplete medical records. Moreover, after examining the same records, the two doctors initially reached *opposite* conclusions with respect to this domain. Dr. Randall found a "marked" limitation (120), while Dr. Brust found a "less than marked limitation" (229).

While Dr. Brust subsequently changed her assessment, she did so at the hearing itself, after hearing Ms. Watson state that Jah-mere had recently been in the ICU for a week with hypoglycemia and then hospitalized "on a regular floor for four days" (461). It is unclear whether Dr. Brust would still have changed her assessment had she reviewed the hospital records herself and learned that Ms. Watson's testimony not only greatly exaggerated the length of Jah-mere's stay in the ICU and in the hospital, but incorrectly implied that Jah-mere's hypoglycemia was the cause of his hospitalization.

Similarly, this Court is unpersuaded by the opinion of Jah-mere's speech pathologist, Tracey Hirn, that Jah-mere had a "marked" limitation in the domain of "Health and physical well-being." Plaintiff's Memo at 22-23. Jah-mere's Special Education teacher, Noelle Vercesi, concluded that Jah-mere had no limitation whatsoever in this domain (402). Moreover, while Ms. Hirn is presumably qualified to render an opinion relating to limitations flowing from Jah-mere's speech and language delays, there is nothing in the record to suggest that she has the expertise necessary to state an opinion with respect to Jah-mere's health and physical well-being.

## CONCLUSION

For the reasons stated above, this case is remanded for a rehearing in accordance with this Memorandum and Order. *See Rosa*, 168 F.3d at 82-83. On remand, the ALJ shall ascertain

whether Jah-mere has a regular pediatrician and, if so, shall affirmatively seek to obtain all

relevant records from this doctor.  The ALJ shall also affirmatively seek to obtain any hospital

records which have not yet been made part of the Administrative Record, and shall reassess this

case in view of such documents, together with such documents which are already part of the

Administrative Record.

      **SO ORDERED.**

                        /s/
                  SANDRA L. TOWNES
                  United States District Judge

Dated: Brooklyn, New York
       December 14, 2006